In the United States District Court
for the District of Idaho

| | |
|---|---|
| Cory Edwards, | |
| *On behalf of himself and those similarly situated*, | Case No. _____ |
| Plaintiff, | Judge |
| v. | |
| PJ Ops Idaho, LLC; Papa John's International, Inc.; and Tom Wylie; | Jury Demand Endorsed Hereon |
| Defendants. | |

Class and Collective Action Complaint

1.     Plaintiff Cory Edwards, on behalf of himself and all similarly-situated individuals, brings this action against Defendants Papa John's International, Inc., PJ Ops Idaho, LLC, and Tom Wylie (collectively "Defendants"). Plaintiff seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiff and similarly-situated individuals with minimum wages as required by the Fair Labor Standards Act ("FLSA") and Idaho wage law.

2.     Papa John's International, Inc. ("PJI") is the third largest pizza chain in the world.

3.     The majority of Papa John's restaurants—approximately 85%—are operated by franchisees.

4.     PJ Ops Idaho, LLC and Tom Wylie own and operate Papa John's' franchise locations in the Boise, Idaho area. Defendants also operate Papa John's franchisees in Kentucky, Colorado, Louisiana, and Kansas (the "PJ Ops Stores").

5.     Plaintiff Edwards works for Defendants as a delivery driver at their Papa John's Pizza restaurant at 1323 Broadway in Boise, Idaho.

6.     Defendants have repeatedly violated the FLSA and Idaho wage law by improperly applying a tip credit to delivery driver wages, and by failing to adequately reimburse delivery drivers for their delivery expenses, thereby failing to pay delivery drivers the legally mandated minimum wage for all hours worked, and minimum overtime rate for hours worked in excess of 40 per workweek.

7.     Defendants maintain a policy and practice of failing to reimburse delivery drivers for costs and expenses essential to their employment, including but not limited to automobile costs, gasoline, insurance, and automobile maintenance expenses, causing Plaintiff's and similarly situated delivery drivers' wages to fall below minimum wage.

8.     At all relevant times, Defendants have failed to take reasonable steps to ensure delivery drivers received adequate reimbursement for their automobile expenses.

9.     All delivery drivers at the PJ Ops Stores, including Plaintiff, are subject to the same or similar employment policies and practices, including policies and practices with respect to the tip credit, wages, and out-of-pocket expenses.

10.     Defendants maintain a policy and practice of underpaying their delivery drivers in violation of the FLSA, 29 U.S.C. § 201, *et seq.*, and the Idaho Minimum Wage Law, § 44-1501, *et seq.* and Idaho Wage Claim Act, § 45-615.

11.     Plaintiff brings this action on behalf of himself and similarly situated current and former delivery drivers who elect to opt in pursuant to FLSA, 29 U.S.C. § 216(b) to remedy violations of the FLSA wage and hour provisions by Defendants.

12.     Plaintiff brings this action on behalf of himself and similarly situated current and former delivery drivers in Idaho, pursuant to Federal Rule of Civil Procedure 23, to remedy violations of the Idaho Minimum Wage Law and the Idaho Wage Claim Act.

### I.  Jurisdiction and Venue

13.     Under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), this Court has jurisdiction over Plaintiff's FLSA claims.

14.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's Idaho law claims.

15.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because the parties reside in this district, and a substantial part of the events giving rise to the claim herein occurred in this district.

### II.  Parties

**Plaintiff**

**Cory Edwards**

16.     Edwards resides in the District of Idaho.  At all times relevant, Edwards worked within the boundaries of the District of Idaho.

17.     At all times relevant, Edwards was an "employee" of Defendants as defined in the FLSA and Idaho wage law.

18.     Edwards has given written consent to join this action.

**Defendants**

19.     Defendants have jointly employed Plaintiff and similarly situated delivery drivers at all times relevant.

20.     Each of the Defendants had control over Plaintiff and similarly situated delivery drivers' working conditions.

21.     Defendants are part of a single integrated enterprise.

22.     At all times relevant, the PJ Ops Stores shared common management and were centrally controlled and/or owned all Defendants.

23.     At all times relevant, Defendants maintained control over labor relations at the PJ Ops Stores.

24.     During all relevant times, Defendants permitted employees to transfer or be shared by and between the PJ Ops Stores without retraining.

25.     Defendants share or co-determine those matters governing the essential terms and conditions of employment for Plaintiff and similarly situated delivery drivers at the PJ Ops Stores.

26.     Defendants suffer or permit Plaintiff and other delivery drivers to work.

27.     Defendants have direct or indirect control of the terms and conditions of Plaintiff's work and the work of similarly situated delivery drivers.

28.     PJI possesses authority to control employees' terms and conditions of employment at the PJ Ops Stores, and also exercises that authority.

29.     During all relevant times, Defendants exercised operational control over the delivery drivers at the PJ Ops Stores, including, but not limited to, control over recruiting and training of delivery drivers, compensation of delivery drivers, job duties of delivery drivers, reimbursements to delivery drivers, recruiting and training managers, design and layout of the restaurants, sales and marketing programs, public relations programs, promotional services, appearance and conduct standards, inventory, and inventory controls.

**Papa John's International, Inc.**

30.    Defendant PJI is a foreign corporation organized under the laws of the state of Delaware, with its principal place of business in Kentucky.

31.    PJI is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA and Idaho wage law.

32.    Upon information and belief, PJI applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

33.    At all relevant times, PJI maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

34.    At all relevant times, PJI has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

35.    PJI's gross revenue exceeds $500,000 per year.

**PJ Ops Idaho, LLC**

36.    PJ Ops Idaho, LLC is a foreign limited liability company organized and existing under the laws of the state of Kentucky.

37.    Tom Wylie is a "member" and the "CFO" of PJ Ops Idaho, LLC.

38.    "PJ Ops Idaho, LLC" is the corporate entity that appears on the paystubs Plaintiff received for work he completed for Defendants.

39.    PJ Ops Idaho, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA and Idaho wage law.

40.     Upon information and belief, PJ Ops Idaho, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, clock in/out procedures, and reimbursement of automobile expenses.

41.     PJ Ops Idaho, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, expense reimbursements, and other practices.

42.     PJ Ops Idaho, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

43.     PJ Ops Idaho, LLC's gross revenue exceeds $500,000 per year.

**Tom Wylie**

44.     Upon information and belief, Tom Wylie lives in Lexington, Kentucky.

45.     Tom Wylie is a member of PJ Ops Idaho, LLC and its Chief Financial Officer.

46.     Upon information and belief, Tom Wylie is the owner of PJ Ops Idaho, LLC.

47.     Upon information and belief, Tom Wylie is also the owner of a number of other entities that manage Papa John's franchisees, including, but not limited to PJ Ops Colorado, LLC; PJ Ops Kansas, LLC; PJ Ops Louisiana, LLC; PJ Ops New York, LLC; PJ Operations d/b/a Papa John's Kentucky; and PJ Holdings KY, LLC.

48.     Upon information and belief, Tom Wylie is also an executive at MAP, LLC and MAP II, LLC, two entities involved in operating Papa John's franchisees located in Lexington, Kentucky.

49.     All of these entities maintain their principal place of business at 1999 Richmond Rd., Suite 300, Lexington, KY 40502-1200.

50.     At all relevant times, Tom Wylie has been an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA and Idaho wage law.

51.     At all relevant times, Tom Wylie has been actively involved in managing the operations of the PJ Ops Stores.

52.     At all relevant times, Tom Wylie has had control over Defendants' pay policies.

53.     At all relevant times, Tom Wylie has had power over personnel and payroll decisions at the PJ Ops Stores.

54.     At all relevant times, Tom Wylie has had the power to stop any illegal pay practices that harmed Plaintiff and similarly situated employees.

55.     At all times relevant, Tom Wylie has had the power to transfer the assets and liabilities of each of the named corporate defendants.

56.     At all relevant times, Tom Wylie has had the power to declare bankruptcy on behalf of each of the named corporate defendants.

57.     At all relevant times, Tom Wylie has had the power to enter into contracts on behalf of each of the named corporate defendants.

58.     At all relevant times, Tom Wylie has had the power to close, shut down, and/or sell each of the named corporate defendants.

**III.    Facts**

**Classwide Factual Allegations**

59.     During all relevant times, Defendants have operated Papa John's Pizza restaurants in the states of Idaho, Colorado, Kansas, Louisiana, New York, and Kentucky.

60.     The primary function of the PJ Ops Stores is to sell pizza and other food items to customers, whether they carry out or have their food delivered.

61.    Each of the PJ Ops Stores employs delivery drivers who are primarily responsible for delivering pizzas and other food items to customers' homes and workplaces.

62.    Plaintiff and the similarly situated persons Plaintiff seek to represent are current and former delivery drivers employed by Defendants at the PJ Ops Stores.

63.    All delivery drivers employed at the PJ Ops Stores over the last three years have had essentially the same job duties—deliver pizza and other food items to customers.

64.    When there are no deliveries to make, Defendants' delivery drivers are required to work inside the PJ Ops Stores building pizza boxes, making pizzas, cleaning, preparing food items, taking orders, and completing other duties inside the restaurant as necessary.

65.    At some point in the past year, Defendants' delivery drivers started to be paid minimum wage while working inside the store. Prior to that change, Defendants' delivery drivers were paid minimum wage minus a tip credit for all hours worked.

66.    Defendants' delivery drivers are paid minimum wage minus a tip credit while they are out on the road making deliveries, and have been throughout the period relevant to this dispute.

67.    Defendants did not properly claim a tip credit from delivery drivers' wages because they did not provide notice pursuant to 29 U.S.C. § 203(m).

68.    Defendants did not properly claim a tip credit from delivery drivers' wages because they did not actually pay the tip credit minimum wage amount.

69.    Defendants require delivery drivers to maintain and pay for operable, safe, and legally compliant automobiles to use in delivering Defendants' pizza and other food items.

70.    Defendants require delivery drivers to incur and/or pay job-related expenses, including but not limited to automobile costs and depreciation, gasoline expenses, automobile

maintenance and parts, and other equipment necessary for delivery drivers to complete their job duties.

71.     Pursuant to such requirements, Plaintiff and other similarly situated employees purchase gasoline, vehicle parts and fluids, automobile repair and maintenance services, automobile insurance, and suffered automobile depreciation all for the primary benefit of Defendants.

72.     At all relevant times, Plaintiff and other similarly situated delivery drivers were reimbursed a flat per delivery amount, no matter how many miles the delivery driver travelled to complete the delivery.

73.     At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses.

74.     Plaintiff and similarly situated delivery drivers typically average four to seven miles per delivery.

75.     Plaintiff and similarly situated delivery drivers typically make approximately 2-3 deliveries per hour.

76.     According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

        a.     2014: 56 cents/mile
        b.     2015: 57.5 cents/mile
        c.     2016: 54 cents/mile
        d.     2017: 53.5 cents/mile

77.     As a result of the automobile expenses incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA and Idaho law.

78.     Defendants' managers at times also clock delivery drivers out onto their lower, "delivery pay rate" before a delivery order is ready to go out the door and while the delivery drivers are still completing tasks inside the store. This is done in an effort to improve the store's Customer Service Score, a metric created by PJI to evaluate performance based on, among other things, how long it takes for an order to go out for delivery. As a result, delivery drivers were regularly required to work in a non-tipped capacity while being paid at a tipped wage rate.

79.     Defendants have failed to maintain records of delivery drivers' compensation.

80.     At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at the PJ Ops Stores.

81.     All of Defendants' delivery drivers had similar experiences to those of Plaintiff. They were subject to the same pay rates; the same reimbursement policy; received similar reimbursements; incurred similar automobile expenses; completed deliveries of similar distances and at similar frequencies; and were paid at or near the applicable minimum wage rate before deducting unreimbursed vehicle costs.

82.     Regardless of the precise amount of the per-delivery reimbursement at any given point in time, Defendants' reimbursement formula has resulted in an unreasonable underestimation of delivery drivers' automobile expenses throughout the recovery period, causing systematic violations of the federal minimum wage.

83.     Because Defendants paid their drivers a gross hourly wage at precisely, or at least very close to, the applicable minimum wage, and because the delivery drivers incurred unreimbursed automobile expenses and had deductions taken from their wages for the benefit of Defendants, the delivery drivers "kicked back" to Defendants an amount sufficient to cause minimum wage violations.

84.    While the amount of Defendants' actual reimbursements per delivery may vary somewhat over time, Defendants are relying on the same flawed policy and methodology with respect to all delivery drivers at all of their other Papa John's stores. Thus, although reimbursement amounts may differ somewhat by time or region, the amounts of under-reimbursements relative to automobile costs incurred are relatively consistent between time and region.

85.    Defendants' low reimbursement rates were a frequent complaint of at least some of Defendants' delivery drivers, yet Defendants continued to reimburse at a rate much less than any reasonable approximation of delivery drivers' automobile expenses.

86.    Defendants have willfully failed to pay federal and Idaho state minimum wage and overtime to Plaintiff and similarly situated delivery drivers at the PJ Ops Stores.

### Plaintiff's Individual Factual Allegations

87.    Defendants harmed Plaintiff in a manner consistent with their policies, patterns, and practices as described herein.

**Cory Edwards**

88.    Edwards has worked at the Papa John's Pizza restaurant located on Broadway in Boise, Idaho since 2012.

89.    Edwards typically worked approximately 30-35 hours per week for Defendants.

90.    As a delivery driver, Edwards delivered pizza and other food items to Defendants' customers' homes and businesses.

91.    When he was not making deliveries, Edwards worked inside the restaurant, completing tasks such as taking orders, making pizza, building pizza boxes, taking out trash,

sweeping up the food line, mopping and sweeping, and completing other general tasks within the store.

92.     At all times during his employment, Edwards was qualified to perform the essential functions of his job and performed his duties competently.

93.     Within the past year, Defendants changed their compensation policy with respect to Edwards, and began paying him at two different rates—minimum wage while working inside the store, and minimum wage minus a tip credit while on the road making deliveries. Prior to this change, however, Edwards was paid minimum wage minus a tip credit for all hours worked.

94.     Throughout his employment, Edwards has spent more than 20% of his time at work inside the store completing non-tipped duties.

95.     Edwards regularly made approximately three deliveries per hour during the hours he works as a delivery driver.

96.     During Edwards' employment with Defendants, Defendants failed to adequately reimburse Edwards for automobile and other job-related expenses.

97.     Edwards has been reimbursed approximately $1.00 or $1.05 for each delivery he completed for Defendants throughout his employment.

98.     Edwards regularly drove between 4 to 7 miles round trip per delivery.

99.     Thus, Defendants' average effective reimbursement rate for Edwards was approximately $.19 per mile ($1.05 per delivery / 5.5 average miles per delivery).

100.     During 2017, for example, the IRS business mileage reimbursement has been $.535 per mile, which reasonably approximated the automobile expenses incurred delivering pizzas. http://www.irs.gov/Tax-Professionals/Standard-Mileage-Rates. Using that IRS rate as a reasonable approximation of Edwards' automobile expenses, every mile driven on the job

decreased his net wages by approximately $.345 ($.535 - $.19) per mile. Considering Edwards'
estimate of about 5.5 average miles per delivery, Defendants under-reimbursed him about $1.898
per delivery ($.345 x 5.5 average miles).

101.    Thus, Edwards consistently "kicked back" to Defendants approximately $5.69 per
hour ($1.898 per delivery x 3 deliveries per hour).

102.    Since being changed to the dual rate compensation structure, Edwards has been
regularly required to work inside the restaurant while being paid at his delivery pay rate because
he would be clocked out early onto his delivery pay rate by managers who were concerned with
meeting certain metrics about timely delivery.

103.    As a result of unreimbursed improperly taking a tip credit from Edwards' wages,
automobile expenses, and clock in/out procedures, Defendants have failed to pay Edwards
minimum wage as required by law.

**Joint Employer Allegations**

104.    At all relevant times, Defendants jointly employed Plaintiff and similarly situated
employees at the PJ Ops Stores.

105.    PJI exercises substantial control over Plaintiff and similarly situated delivery
drivers, both directly and indirectly.

106.    PJI has the power to curtail the unlawful policies, patterns and/or practices alleged
herein, but has refrained from doing so in order to continue to reap the profits from the franchise
relationship.

107.    PJI has a clear and direct interest in franchise stores minimizing labor costs to
increase profitability—even if it means minimizing labor costs below state and federal

minimums—particularly if they are permitted to collect profits while also being insulated from legal liability.

108. In 2016, Papa John's did $3.7 billion in global system-wide sales.

109. In 2016, PJI's adjusted earnings per share was $2.55, a 22% increase over 2015.

110. PJI opened its 5,000th store in December 2016.

111. In their 2016 Annual Report, PJI states: "With our rapid growth and expansion poised to continue in 2017 and beyond, *it's important to stay true to our approach of operating one store 5,000 times*."

112. As of December 25, 2016, there were 5,097 Papa John's Pizza restaurants in operations worldwide.

113. Of those 5,097 restaurants, 4,353 were franchise stores.

114. PJI devotes significant resources to providing franchisees with assistance in restaurant operations, training, marketing, site selection and restaurant design, and requires their franchisees to closely adhere to PJI's operating standards and procedures. These actions directly and indirectly control the work of delivery drivers at the PJ Ops Stores.

115. Franchisees pay 5% of net sales as a royalty fee to PJI.

116. In 2016, PJI earned $102,980,000.00 in royalty fees from its franchise stores.

117. Franchisees' "net sales" are determined not by the franchisee but by PJI, through PJI's Information System, which franchisees are required to use.

118. PJI's franchisees must get approval from PJI for restaurant design and location from a member of the PJI development team. PJI assists its franchisees in selecting sites, developing restaurants, and evaluating physical locations. PJI provides layout and design

services for subcontractors, signage installers and telephone systems. Franchisees may purchase complete new store equipment packages but only through an approved third-party supplier.

119.    According to PJI, with few exceptions, domestic restaurants do not offer a dine-in area. As such, franchisees operating Papa John's restaurants are restricted from offering anything but delivery or carryout services to their customers.

120.    PJI provides franchisees with specifics for fixtures, furnishings, décor, communications, and computer hardware and software, signs and equipment.

121.    When a franchisee opens a new restaurant, PJI corporate employees come to the restaurant to assist with the opening, and focuses on on-site training of team members, and training management on staffing.

122.    PJI's franchisees are contractually obligated to adhere to PJI's proprietary system for operations, which includes special recipes and menu items; distinctive design, décor, color scheme and furnishings; software and programs; standards, specifications and procedures for operations; systems for communicating with PJI, suppliers, and customers; procedures for quality control; training assistance; and advertising and promotional programs. PJI refers to these dictates, taken together, as the "System."

123.    PJI provides franchisees with operating manuals ("Manuals") that contain the mandatory and suggested specifications, standards and operating procedures prescribed by PJI.

124.    If and when PJI amends or modifies their Manuals, franchisees must promptly adopt and use the formulas, methods, procedures, policies, menus, recipes, food products, and other standards and specifications contained in the Manuals, policy and procedure statements and other written notices as issued and/or as modified from time to time by PJI.

125.    Franchisees also receive a Papa John's Franchise Team Member Handbook, which is drafted and provided by PJI, and explains job responsibilities of franchisees' employees and operations of Papa John's restaurants.

126.    Franchisees are not permitted to implement any change in the System without PJI's prior consent.

127.    However, PJI, in its sole discretion, may modify the System, including specific standards, policies, and/or procedures, with respect to any franchisee based on PJI's assessment of the franchisee's particular situation.

128.    PJI periodically inspects and evaluates each franchisee's operations at such times and in such manner as PJI reasonably determines.

129.    PJI inspects franchisees to ensure compliance with all required standards, specifications and procedures of the System, the franchise agreement, and the Manuals. Those inspections may include review sales and order forms, observing all employees, interviewing all employees, interviewing customers, and conducting any type of audit or review necessary to evaluate the franchisee's compliance with all required standards, specifications, or procedures.

130.    PJI retains the right to make suggestions and give mandatory instructions to franchisees with respect to their operation of the restaurants, as PJI considers necessary or appropriate to ensure compliance with the then-current quality standards and other requirements of the System and to protect the goodwill and image of PJI.

131.    PJI requires that each franchisee have a Principal Operator, and that the Principal operator be responsible for, among other things, supervising employees to ensure that the highest standard of service, as defined by PJI, is maintained.

132.    Principals and managers at franchise restaurants are required to complete Papa John's University, which teaches them every aspect of the proper operation of a Papa John's restaurant, and was created by PJI. Papa John's University involves a minimum of ten weeks of training on everything from making a pizza to managing a multi-unit Papa John's operation.

133.    All managers, including shift managers, must be certified in PJI's operational standards.

134.    PJI requires franchisees to conduct training using materials, equipment and supplies provided by PJI.

135.    PJI has an online training system called Cornerstone that franchise employees are required to complete.

136.    PJI training includes time dedicated to specific categories that directly affect delivery drivers: establishing an opening and closing routine, taking an order, making a pizza, delivering a pizza, customer care, food prep, food safety, cleaning and sanitation, shift management, safety and security, inventory management, dough management, organization of storage areas, cash management, labor management, retention, training, workplace harassment, labor scheduling, performance management, recruiting, marketing, and coaching, among others. Each of these categories is specifically addressed in the training materials created by PJI.

137.    All team members must complete a new team member orientation training and be certified in three of the seven work stations (work stations are defined by PJI). New team member orientation and at least one station training certification must be completed in the first five shifts of employment, and the second and third station training certifications must be completed by the employee's twentieth shift.

138.   PJI reserves the right to require any of the franchisees' employees to go through the training certification process.

139.   Each franchisee is assigned a franchise business director from PJI, who communicate PJI's operating and marketing information and new initiatives to the franchisees.

140.   Ongoing compliance with franchisee training requirements is monitored by the PJI's Global Operations Support and Training Team.

141.   The PJI Franchise Advisory Council consists of company and franchisee representatives who hold regular meetings to discuss operations, growth, and other business issues.

142.   PJI acknowledges that labor costs and labor-related benefits are primary components in the cost of operation of Papa John's restaurants.

143.   PJI states that in order to ensure compliance with the quality standards and other requirements of the System, franchisees must operate their restaurant through strict adherence to the standards, specifications, and policies of the System as they exist at the time, and as they may from time to time be modified. Such standards and policies include: specifications and preparation methods for food and beverages, days and hours of operation, menu items and services offered, requirements and specifications for uniforms and/or attire of restaurant personnel, use of specified emblems and Marks on containers, bags, boxes, napkins, and other products, methods of payment accepted from customers, and data privacy and security.

144.   PJI advertises job openings that exist at franchise locations.

145.   Upon information and belief, PJI created the job descriptions and job postings describing the pizza delivery driver role at the franchise locations.

146.    On the same page as an advertisement for a franchise delivery driver position on jobs.papajohns.com (specifically, *e.g.*, http://jobs.papajohns.com/us/en-US/Job-Details/Delivery-Driver-Job/Cleveland-OH/XjdP-jf755-ct103513-jid70203210), PJI has posted a three-minute video that describes PJI's operations with the caption: "Learn what it's like to work at a Papa John's Restaurant." The video makes no distinction between the operations of a corporate store compared to a franchise store, and describes the job duties of in store employees and delivery drivers at Papa John's.

147.    On job postings for job vacancies at Papa John's franchise stores, PJI describes itself as an "employer."

148.    PJI requires that the delivery drivers at their franchise stores have a clean driving record.

149.    PJI restricts franchisees from making or collecting any delivery charge or other separate charge for delivered products, regardless of how named or characterized, without PJI's approval.

150.    PJI dictates the geographic area within which any franchisee may open a store or deliver pizza. This directly affects the amount of miles driven by delivery drivers to make deliveries. Franchisees are not permitted to modify the geographic area without PJI's approval.

151.    PJI's Information System evaluates franchisees by, among other ways, giving them a Customer Service Score based on the deliveries they complete. One of the factors in the Customer Service Score is how much time elapses between an order being received by the restaurant and the order going out on the road for delivery. Bonuses for store managers are closely tied to Customer Service Scores.

152.    As a result of the Customer Service Score metric, delivery drivers around the country are clocked out onto their lower hourly rate early—before the pizza is ready to go out for delivery—so that the computer system indicates that the order went out for delivery earlier than it actually did. As a result, delivery drivers are regularly being paid at their delivery pay rate while still working inside the store, completing non-tipped duties.

153.    PJI boasts that it has received the number one customer satisfaction rating for quick service pizza restaurants for fifteen of the last seventeen years. By claiming credit for this metric, they are necessarily claiming credit for the service provided by thousands of franchisee employees.

154.    PJI has internally developed a proprietary point of sale system called FOCUS. FOCUS is integrated with PJI's online ordering system.

155.    All Papa John's franchisees in the United States are required to use FOCUS.

156.    In 2015, PJI made $9.8 million selling licenses to FOCUS to its franchisees, and requires franchisees to pay for FOCUS on an ongoing basis.

157.    FOCUS "allows the restaurant manager to better monitor and control food and labor costs."

158.    FOCUS is the system on which delivery drivers clock in and out for work completed for franchisees.

159.    FOCUS closely monitors employee activity.

160.    FOCUS tracks all activities by employees after an order is received.

161.    PJI requires its franchisees to license all PJI ordering applications and to accept orders through PJI's online ordering systems.

162.    PJI requires its franchisees to pay a percentage of sales obtained through PJI's online ordering systems to PJI.

163.    In 2016, 56% of orders to Papa John's domestic restaurants were made online, compared to just 25% of orders in 2009. This impacts franchisees because a higher portion of their profits go directly to PJI when orders are made online, in the form of a percentage based fee on the order, giving them even thinner profit margins. It also affects employees in the franchise stores, as they spend less time taking orders by phone and more time completing other tasks in the store or on the road making deliveries.

164.    PJI requires franchisees to purchase all food products, ingredients, cooking materials, beverages, containers, boxes, cups, packaging, menus, uniforms, and other products from either a Papa John's Quality Control Center or a supplier who is pre-approved by PJI.

165.    Nearly all of the ingredients and toppings used and sold in franchise stores must be purchased from Papa John's Quality Control Center, which delivers to individual restaurants, or other suppliers approved by PJI.

166.    In 2016, PJI earned $681,606,000.00 from its commissary and related sales.

167.    Papa John's franchise stores are required to join advertising cooperatives where they contribute a percentage of their sales for PJI-approved marketing campaigns. The contribution to the cooperative cannot be less than 2% of sales without approval from PJI.

168.    Restaurant level and cooperative marketing efforts are supported by media, print, digital, and electronic advertising materials that are produced by Papa John's Marketing Fund, Inc. Papa John's franchise stores are required to contribute a certain minimum percentage of sales to Papa John's Marketing Fund, Inc. Currently, domestic franchises contribute 4.25% of sales to Papa John's Marketing Fund, Inc.

169.    Franchisees are not permitted to conduct their own marketing campaigns without the prior approval of PJI.

170.    PJI requires franchisees to adhere to strict accounting and recordkeeping standards, and require franchisees to make their financial information available to PJI upon request.

171.    PJI has a right to terminate a franchise agreement if a franchisee fails to make payments or fails to adhere to our operational policies and standards.

172.    At all times relevant, Papa John's franchisees acted as agents of PJI. Franchisees employed Plaintiff and other delivery drivers for the mutual benefit of PJI and those franchisees.

173.    PJI's actions indicated to franchisee employees that they were PJI employees.

174.    While working, Plaintiff and similarly situated delivery drivers were required to affix Papa John's signs to their vehicles, toe wear uniforms prominently featuring the Papa John's logo and use delivery bags featuring the Papa John's logo.

175.    Prospective employees complete applications that feature the Papa John's logo and reference working at Papa John's.

176.    Plaintiff and similarly situated delivery drivers were required to watch training videos provided by PJI.

177.    Plaintiff and similarly situated delivery drivers reasonably relied on representations by franchisees and by PJI that they were Papa John's team members and employees.

178.    The control PJI has exerted over its franchisees exceeds any control necessary to protect Papa John's trademark or good will.

179.     PJI authorized and condoned the violations alleged herein, and franchisees acted within the course and scope of their agency in implementing the policies in question.

180.     PJI has been aware and/or should have been aware of the wage and hour violations alleged herein, and had the authority to stop them from happening.

181.     Along with the other Defendants, PJI jointly employed Plaintiff and similarly situated delivery drivers at the PJ Ops Stores.

182.     Papa John's franchisees are facing unpaid wage litigation across the country based on delivery driver under-reimbursement, while PJI's valuation continues to increase.

183.     New York Attorney General Eric Schneiderman has called on PJI "to step up and stop the widespread lawlessness plaguing [its] businesses and harming the workers who make and deliver [its] food."

## IV.     Collective Action Allegations

184.     Plaintiff bring the First and Second Counts on behalf of themselves and all similarly situated current and former delivery drivers employed at the PJ Ops Stores or at other stores in Kentucky, Kansas, Colorado, Louisiana, New York, and elsewhere owned, operated, and controlled by any of the named Defendants nationwide who (1) are or were reimbursed at a flat reimbursement rate, and/or (2) have at any time been paid minimum wage minus a tip credit for the time they spent working inside Defendants' restaurants during the three years prior to the filing of this Class Action Complaint and the date of final judgment in this matter, who elect to opt-in to this action (the "FLSA Collective").

185.     At all relevant times, Plaintiff and the FLSA Collective have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of

willfully refusing to pay Plaintiff and the FLSA Collective minimum wage for all hours worked, improperly applying the tip credit to the wages of Plaintiff and the FLSA Collective, failing to reimburse delivery drivers for automobile expenses and other job-related expenses, and for Defendants' clock in/out policies. Plaintiff's claims are essentially the same as those of the FLSA Collective.

186.    Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by failing to properly pay Plaintiff and the FLSA Collective.

187.    Defendant Wylie operates a number of franchisees throughout the country under the "PJ Ops" umbrella, including PJ Operations, LLC, PJ Ops Kansas, LLC, PJ Ops Colorado, LLC, PJ Ops Louisiana, LLC, and PJ Ops New York, LLC.

188.    Defendants are aware or should have been aware that federal law required them to pay employees at least full minimum wage for all hours worked in a non-tipped capacity.

189.    Defendants are aware or should have been aware that federal law required them to reimburse delivery workers for expenses relating to "tools of the trade," such as, among other things, automobile costs and gasoline for delivery drivers.

190.    Defendants' unlawful conduct has been widespread, repeated, and consistent.

191.    The First and Second Counts are properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

192.    The FLSA Collective members are readily identifiable and ascertainable.

193.    For the purpose of notice and other purposes related to this action, the FLSA Collective members' names and contact information are readily available from Defendants' records.

194.     In recognition of the services Plaintiff has rendered and will continue to render to the FLSA Collective, Plaintiff will request payment of a service award upon resolution of this action.

**V.     Class Action Allegations**

195.     Plaintiff bring the Third Count under Federal Rule of Civil Procedure 23, on behalf of himself and a class of persons consisting of:

> All persons who work or worked as Delivery Drivers and similar employees for Papa John's International, Inc., PJ Ops Idaho, LLC, and/or Tom Wylie in Idaho between June 29, 2015 and the date of final judgment in this matter ("Rule 23 Class").

196.     Excluded from the Rule 23 Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

197.     The number and identity of the Rule 23 Class members are ascertainable from Defendants' records.  The hours assigned and worked, the positions held, and the rates of pay and reimbursement for each Rule 23 Class Member are also determinable from Defendants' records.  For the purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendants.  Notice can be provided by means permissible under Federal Rule of Civil Procedure 23.

198.     The Rule 23 Class member are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

199.     There are more than 50 Rule 23 Class members.

200.   Plaintiff's claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

201.   Plaintiff and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to reimburse for expenses, and failing to pay Plaintiff in a timely manner.

202.   Plaintiff and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the Idaho wage laws.

203.   Plaintiff and the Rule 23 Class members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns of conduct.  Defendants' corporate-wide policies and practices affected all Rule 23 Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

204.   Plaintiff and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

205.   By seeking to represent the interests of the Rule 23 Class members, Plaintiff is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

206.   Plaintiff is able to fairly and adequately protect the interests of the Rule 23 Class and have no interests antagonistic to the Rule 23 Class.

207.   Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

208.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.  Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them.  On the other hand, important public interests will be served by addressing the matter as a class action.  The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs.  The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition of their interests through actions to which they were not parties.  The issues in this action can be decided by means of common, class-wide proof.  In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

209.    Upon information and belief, Defendants and other employers throughout the state violate the Idaho wage laws.  Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation.  Former employees are fearful of bringing claims because

doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

210.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

211.    Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Plaintiff and the Rule 23 Class members individually and include, but are not limited to:

    a.   Whether Defendants paid Plaintiff and the Rule 23 Class members at the proper minimum wage rate for all hours worked;

    b.   Whether Defendants are permitted to take a tip credit from the wages of Plaintiff and the Rule 23 Class members for all or some of the hours they worked;

    c.   Whether Defendants failed to reimburse automobile expenses, as described herein, causing Plaintiff and the Rule 23 Class members' wages to drop below legally allowable minimum wage and overtime;

    d.   Whether Defendants' policy of failing to pay Plaintiff and the Rule 23 Class was instituted willfully or with reckless disregard of the law; and

    e.   The nature and extent of class-wide injury and the measure of damages for those injuries.

**VI.    Causes of Action**

**<u>Count 1</u>**
**Failure to Pay Minimum Wages - Fair Labor Standards Act**
**(On Behalf of Plaintiff and the FLSA Collective)**

212.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

213.     Plaintiff and the FLSA Collective are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

214.     Defendants required Plaintiff and the FLSA Collective to pay for automobile expenses out of pocket, failed to reasonably calculate the value of said expenses, and failed to adequately reimburse Plaintiff and the FLSA Collective for said expenses.

215.     Defendants took deductions from the wages of Plaintiff and the FLSA Collective for uniforms and insurance.

216.     Defendants' clock in/out practices resulted in Plaintiff and the FLSA Collective being required to complete non-tipped work while being paid a tipped wage rate.

217.     Because Defendants failed to pay Plaintiff and the FLSA Collective the proper tipped minimum wage rate, they are not permitted to take a tip credit from the wages of Plaintiff and the FLSA Collective.

218.     By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiff and the FLSA Collective.

219.     Plaintiff and the FLSA Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

220.     As a result of Defendants' willful violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

### Count 2
### Failure to Pay Overtime Wages – Fair Labor Standards Act
### (On Behalf of Plaintiff and the FLSA Collective)

221.     Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

222.     Plaintiff and the FLSA Collective worked more than forty hours in one or more workweeks.

223.     Because Defendants required Plaintiff and the FLSA Collective to pay for automobile expenses and other job-related expenses out of pocket, Defendants did not pay Plaintiff and the FLSA Collective at least one and a half times their normal hourly rate for time worked in excess of forty hours per workweek.

224.     By not paying Plaintiff and the FLSA Collective proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have willfully violated the FLSA.

225.     As a result of Defendants' willful violations, Plaintiff and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

**Count 3**
**Failure to Pay Wages – Idaho Minimum Wage Law and Wage Claim Act**
**(On Behalf of Plaintiff and the Rule 23 Class)**

226.     Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

227.     Defendants paid Plaintiff and the Rule 23 Class below minimum wage for the hours they worked by impermissibly taking a tip credit from Plaintiff and the Rule 23 Class' wages and by requiring them to cover automobile expenses without adequate reimbursement.

228.     Defendants are employers of Plaintiff and the Rule 23 Class as the term is defined Idaho Code § 44-1503 and Idaho Code § 45-601.

229.     By failing to pay Plaintiff and the Rule 23 Class minimum wage for all hours worked, Defendants have violated Idaho Code § 44-1502.

230.    By failing to pay Plaintiff and the Rule 23 Class full minimum wage for all hours worked in a non-tipped capacity, Defendants have violated Idaho Code § 44-1502.

231.    As a result of Defendants' failure to pay Plaintiff and the Rule 23 Class the wages they are due, Plaintiff and the Rule 23 Class are entitled to unpaid wages, the greater of the penalty damages provided by Idaho Code § 45-607 or treble damages as provided by Idaho Code § 45-615, and reasonable attorneys' fees and costs. *See* Idaho Code § 44-1508.

**WHEREFORE**, Plaintiff Cory Edwards prays for all of the following relief:

A.    Designation of this action as a collective action on behalf of the collective action members and prompt issuance of notice to all similarly-situated members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and his counsel to represent the collective action members.

B.    Unpaid minimum wages, reimbursement of expenses, and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.    Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.    Designation of Plaintiff as representative of the Rule 23 Class and counsel of record as Class Counsel;

E.    A declaratory judgment that the practices complained of herein are unlawful under Titles 44 and 45 of the Idaho Code.

F.    An award of unpaid minimum wages and unreimbursed expenses due under Idaho Code § 44-1502.

G.    An award of damages under Idaho Code § 45-607 or § 45-615, whichever is greater.

H.     An award of prejudgment and post-judgment interest.

I.     An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees.

J.     Such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

/s/ Jeff Hepworth
Jeff Hepworth
**Hepworth Law Offices**
2229 W. State St. Boise, ID 83702
208-333-0702 (Phone)
208-246-8655 (Fax)

Andrew Biller
(*pro hac vice* application forthcoming)
Andrew Kimble
(*pro hac vice* application forthcoming)
**Markovits, Stock & DeMarco, LLC**
3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

*Counsel for Plaintiff and the putative class*

## JURY DEMAND

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ Jeff Hepworth
Jeff Hepworth