UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CORY EDWARDS, et al.,<br><br>*On behalf of himself and those similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>PJ OPS IDAHO, LLC, et al.,<br><br>Defendants. | Case No. 1:17-cv-00283-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendants' Motion to Compel (Dkt. 126) and Plaintiffs' competing Motion for Protective Order (Dkt. 127). In addition, the parties have filed various procedural Motions and "Notices"—some of which the Court has already dealt with—seeking the Court's leave to supplement the briefing on the underlying Motions. Dkts. 137, 141, 143, 144, 146, 147.

Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will rule on the motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons set forth below, the Court GRANTS all Motions/Notices to Supplement the Record and GRANTS in PART and DENIES in PART both Motions.

## II. BACKGROUND

This is a putative hybrid Rule 23 class and 29 U.S.C. § 216(b) collective action. Plaintiffs, who were Defendants' pizza-delivery drivers, assert violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and various states' laws. *See generally* Dkt. 114. Broadly speaking, Plaintiffs assert that Defendants underpaid them and/or failed to adequately reimburse them for certain expenses each incurred during their employment.

On May 15, 2018, the Court conditionally certified a § 216(b) FLSA collective action. Dkt. 67. Notice was sent to 3,846 prospective plaintiffs and, to date, roughly 700 individuals have consented to join this action. Plaintiffs have not yet moved for an order certifying their state law claims as Rule 23 class actions. Discovery is ongoing.

In August 2019, the parties notified the Court that they had reached an impasse on certain discovery related issues. One of the points of contention was Defendant's plan—as part of discovery—to send a questionnaire to the opt-in Plaintiffs seeking information about them, their vehicles, and their tenure working for Defendants. The parties participated in the Court's informal discovery dispute process, but were unable to resolve this issue to either side's satisfaction.

Before filing motions on the subject dispute, however, the parties jointly moved to stay this case so they could engage in mediation. Dkt. 118. The parties did so, but were unable to resolve the case. Dkt. 123.[1] After mediation, the parties outlined deadlines by

---

[1] As a procedural matter, the Court never *officially* lifted the stay in this case. This is solely a clerical matter for the Court's internal coding and does not affect the case itself or the pending motions in any substantive way. For clarity, however, the previously imposed stay is hereby lifted.

which they would file any motion related to the ongoing discovery disputes. *Id.*

On December 23, 2019, Defendants filed a Motion to Compel. Dkt. 126. Defendants' Motion seeks an order from the Court compelling Plaintiffs to respond to the questionnaire it intends to send out. *See generally id.* Defendants contend the information is necessary as they prepare to defend against Plaintiffs inevitable motion for class certification—and for their defenses generally in this case. *Id.*

On January 10, 2020, Plaintiffs filed a Motion for Protective Order. Dkt. 127. In their Motion, Plaintiffs seek to avoid answering Defendant's questionnaire. *See generally id.* They argue it is burdensome and that the information Defendants seek is irrelevant. *Id.* Said differently, the motions are mirror opposites of each other. Each motion centers around the questionnaire; Defendants seek to compel responses to the questionnaire; Plaintiffs seek an order shielding them from responding.

As will be discussed in depth below, underpinning this whole situation is the question of how any reimbursement rate should be calculated when determining whether Defendants underpaid Plaintiffs. In essence, Plaintiffs assert there are only two ways to reimburse delivery drivers such as Plaintiffs: 1) by tracking and reimbursing their actual expenses, or 2) by paying them the IRS business mileage rate. Again, these matters will be more fully developed below, but a brief explanation is helpful here to understand more of the procedural background and briefing. Additionally, for context, the Court will introduce the *Hatmaker* case at this time.

*Hatmaker v. PJ Ohio, LLC,* is an ongoing (to the Court's knowledge) case in the Southern District of Ohio that is substantially similar to the case here. No. 3:17-cv-146,

2019 WL 5725043, at *6 (S.D. Ohio Nov. 5, 2019). Plaintiffs rely *heavily* on the *Hatmaker* case in support of their position in this case.[2] Generally speaking, at summary judgment, the Court in *Hatmaker* found there are two ways to calculate reimbursements (the same as those Plaintiffs put forth in this case) and concluded that if the company *did not* track the drivers' expenses, the only remaining alternative is to reimburse them at the IRS rate. *Id.* at *5. Plaintiffs contend this supports their position in this case that Defendants' discovery attempts to question their individual expenses is irrelevant. Plaintiffs also argue the United States Department of Labor Handbook ("DOL Handbook") supports their interpretation.

For its part, Defendants disagree with Plaintiffs conclusion, argue against their reliance on *Hatmaker*, and contend that there is a third way to calculate the reimbursement rate: by reasonably approximating the drivers' expenses. Briefing on the competing motions followed its normal course and has ended. Defendants also argue the DOL Handbook is not binding, but only persuasive, authority in resolving the current dispute.

Because of the Court's heavy civil and criminal caseload, the Court did not have opportunity to rule on this motion as soon as it would have liked. That busy docket, coupled with the COVID-19 pandemic, pushed resolution of this matter until now. The silver lining of this delay, however, is that more information has come to light regarding how courts determine which standard should apply when calculating the reimbursement rate.

On March 6, 2020, Plaintiffs filed a Notice of Supplemental Authority in support of

---

[2] Plaintiffs cite *Hatmaker* 48 times in their original briefs, include dozens of quotes from that court's decisions, and devote pages within their briefs to an analysis of that case and why the Court should follow it here. Of note, many of the same attorneys who represent Plaintiffs in this case represent the Plaintiffs in *Hatmaker.*

their Motion. Dkt. 134. The notice provided the Court with another decision from the *Hatmaker* case. Defendants objected to Plaintiffs filing and asked the Court not to consider the material. Dkt. 135. The Court did not rule on the Motion at that time, but let the short briefing that had been included with the arguments stand.

On September 1, 2020, Defendants filed a Notice of Supplemental Authority in support of their Motion. Dkt. 136. This Notice provided the Court with a copy of a U.S. Department of Labor, Wage and Hour Division ("DOL Letter") opinion letter. It appears from the substance of the DOL Letter that Defendants solicited this opinion from the Department of Labor to ascertain its position on which reimbursement scheme is correct. The DOL Letter outlines its opinion that the IRS rate is optional and that their regulations permit "actual" or "reasonabl[e] approximation" reimbursement. *Id.* at 2.

Plaintiffs immediately requested an opportunity to brief the impact, if any, of the DOL Letter on the pending motions. Dkt. 137. Defendants objected, stating that more briefing was unnecessary, but that if the Court desired, it would file something as well. Dkt. 138. Ultimately, the Court granted the Motion and allowed each party to file an additional brief, not to exceed 10 pages on the "relevance and/or impact, if any, of Defendants' Notice on the motions currently pending before the Court." Dkt. 140.

Plaintiffs filed their brief as a Motion to Supplement. Dkt. 141. Therein, Plaintiffs reiterate the same arguments they have set forth during the pendency of these motions, expand upon them, provide updated citations, and then conclude that the Court should not give the DOL Letter any deference. *Id.* at 8-10.

Defendants likewise obliged the Court and filed a supplemental brief. Dkt. 142.

MEMORANDUM DECISION AND ORDER – 5

Defendants are of the opinion that the DOL Letter supports its arguments, highlights the untenable position Plaintiffs have taken, and supports the use of their discovery questionnaire in this case. *See generally id.*

On October 1, 2020, Plaintiffs filed another Notice of Supplemental Authority (Dkt. 143) and a Motion for Leave to File Supplemental Briefing on the materials in said Notice (Dkt. 144). This Notice was another discovery opinion from the *Hatmaker* court. Interestingly, this particular decision from *Hatmaker* related to the DOL Letter. Apparently, the defendants in the *Hatmaker* case submitted the self-same DOL Letter to the Court in Ohio for its consideration. The Judge in that case did not find the DOL Letter helpful and did not change his prior ruling that the IRS rate was the appropriate standard *for that case*. Dkts. 143, 144. Plaintiffs sought an opportunity to brief the issues further. Dkt. 144. Defendants opposed the motion. Dkt. 145. The Court did not rule on the Motion at that time, but let the short briefing that had been included with the arguments stand.

On December 1, 2020, Plaintiffs filed another Notice of Supplemental Authority. Dkt. 146. This Notice provided the Court with an arbitration order in a similar pizza-delivery driver case in which the arbitrator found that the defendants needed to reimburse the drivers at the IRS rate because they did not track their actual expenses. *Id.* at 1. Plaintiffs supplied this order to the Court in support of their position. Defendants did not respond or otherwise acknowledge this filing.

On December 3, 2020, Defendants, "hesitant to put more papers before the Court," but desiring "fairness," filed a Notice of Supplemental Authority. Dkt. 147. In its Notice, Defendants point out that the arbitrator's order is not binding on the Court. *Id.* Additionally,

Defendants direct the Court's attention to two factually similar cases (both from the District of Colorado)[3] wherein that court recently found that an employer *could* reasonably approximate vehicle expenses when reimbursing drivers. Dkt. 147, 148. Defendants provided the Court with these cases in support of their interpretation of the issues. Plaintiffs did not respond or otherwise acknowledge this filing.

As will be explained below, the original Motion to Compel and Motion for Protective Order have, to some degree, been swallowed up in this legal question of reimbursement. Nonetheless, the Court appreciates the parties' diligence in updating it when new decisions, helpful information, and related caselaw became available. Some of this supplemental information came by way of motion, some by notice, and some in response to other filings. The Court globally accepts all briefing on this matter and grants all notices and motions that have been filed requesting leave to supplement the record.[4]

## III. LEGAL STANDARD

### A. Motion to Compel

Discovery is permitted "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Relevant information "need not be

---

[3] *Blose v. Jarinc, Ltd.*, No.1:18-CV-02184-RM-SKC, 2020 WL 5513383 (D. Colo. Sept. 14, 2020) and *Kennedy v. Mountainside Pizza, Inc*., No.19-CV-01199-CMA-STV, 2020 WL 5076756 (D. Colo. Aug. 26, 2020). Of note, many of the same attorneys who represent Plaintiffs in this case represent the Plaintiffs in these Colorado cases as well.

[4] The Court already granted the Motion filed at Dkt. 137. *See* Dkt. 140. Also, Plaintiffs supplemental brief in response to that request (Dkt. 141) need not have been filed as a formal motion. Finally, because most of the above-mentioned briefs were filed as Notices they did not generate "motions" deadlines in the Court's docket. Regardless, the Court accepts all the filings from both sides, and will give each the weight it deems appropriate.

admissible in evidence to be discoverable." *Id.* A party may move for an order compelling a discovery response pursuant to Federal Rule of Civil Procedure 37(a)(3)(B).

Under Federal Rule of Civil Procedure 37, a party may move to compel discovery responses if, among other things, an opposing party fails to answer interrogatories or produce requested documents. Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv). "While the moving party must make a threshold showing of relevance . . . the party resisting discovery carries the 'heavy burden' of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper." *Strojnik v. Block 22 LLC*, No. 1:18-cv-00556-BLW, 2019 WL 6315523, at *2 (D. Idaho Nov. 25, 2019) (internal citation omitted).

### B. Motion for Protective Order

"Pre-trial discovery is ordinarily accorded a broad and liberal treatment" because "wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (cleaned up). "Under Rule 26, however, '[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *In re Roman Catholic Archbishop of Portland*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting Fed. R. Civ. P. 26(c)(1)). "The party opposing disclosure has the burden of proving 'good cause,' which requires a showing 'that specific prejudice or harm will result' if the protective order is not granted." *Id.* (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)).

## IV. ANALYSIS

Because the two motions at issue compete against each other, the Court will not analyze them separately, but will discuss them simultaneously, injecting the appropriate standards, burdens, and caselaw where appropriate.

### A. Introduction

The Court begins by noting (procedurally) where this case *is not*. This case is not at the summary judgment stage. The instant dispute is a discovery matter and those standards apply.

Additionally, this case is not being adjudicated in the Southern District of Ohio or in the District of Colorado. As will be explained below, the Court understands Plaintiffs' rigorous reliance on *Hatmaker* and Defendants' reliance on the Colorado cases, appreciates those Judges' analyses on the topic, and respects the determinations of those Judges; however, those findings are not binding on the Court. And—hearkening back to the Court's first comment—those arguments were presented to those Courts *at summary judgment* and against that backdrop, not during discovery as is the case here. These differences undercut the applicability and influence of those cases on the Court's decision today.

In each of the cases mentioned, the parties asked the Court to determine—via motions for partial summary judgment—the proper standard for determining minimum wage compliance in FLSA cases. That is not what has happened in this case. Frankly, the Court does not know why the parties did not ask the Court to determine that issue in this case up front. The Court suggested such a course during its informal discovery dispute conference with the parties in August of 2019; however, this path was not pursued. That

said, the Court is not implying fault in any way. This case was stayed pending mediation, and the parties are free to litigate how they best see fit. The Court simply notes that *procedurally* this case is different from the cases the parties rely on in support of their respective positions which makes reliance on those cases all the more tenuous.

To be sure, at this point, with well over 100 pages of briefing on the subject, the question *could* be ripe for adjudication. The Court declines to rule definitively on this matter, however, for two reasons. First, as noted, this matter started as, and continues to be, a discovery issue. Second, the legal dispute is clearly an open question. While the Court has had extensive briefing on the topic already, a motion for summary judgment on a question that appears to be vexing judges across the nation could benefit from expert opinions, oral argument, and potentially even some limited discovery. None of those things have happened as it relates to the pending motions, nor should they have. The Court will decide these discovery motions as it does all discovery motions: in accordance with the appropriate legal standards, including those found in Federal Rules of Civil Procedure 26 and 37.

### B. Background

In their Third Amended Complaint, Plaintiffs claim Defendants "did not reimburse [them] based on a reasonable approximation of the expenses they incurred while completing deliveries . . . [,]" and that doing so caused their wages to fall below the required minimum. Dkt. 114, ¶¶ 10, 11, 453. According to Plaintiffs, they are entitled to reimbursement for their expenses, which allegedly include, "but [are] not limited to depreciation, insurance, taxes, license fees, registration fees, financing costs, gasoline,

maintenance, repairs, [and] parts." *Id.* ¶ 11.

In order to ascertain what these potential expenses could be, Defendants proposed sending out a simple questionnaire to the party Plaintiffs. This questionnaire contains six questions. Dkt. 126-2. Because this questionnaire is the entire substance of the pending motions, the Court will briefly outline its contents.

On page one, under the case caption, is the following title: **<u>DEFENDANTS' DISCOVERY QUESTIONNAIRE TO CORY EDWARDS</u>**. *Id.* (capitalization, bolding, and underlying in original). Following some general instructions on how to complete the questionnaire on pages one and two, the first question simply asks for the individual's name and address.

The second question asks which of Defendants' stores the individual worked at and the applicable timeframe. The questionnaire also asks that the recipient provide documents that show any type of compensation during his or her term of employment.

The third question asks for general automobile information such as the year, make, and model of any vehicle the individual used while in Defendants' employment from July 5, 2014, to the present. Some of the more obscure sub-questions in this section ask for odometer readings, average miles per gallon, and dates of use. This question, too, is followed by a request for any and all supporting documentation. In addition, as part of the "notes" section following the actual question, there is another question that asks if the person has ever sought an itemized tax deduction for unreimbursed business expenses related to his or her employment.

Question number four seeks information regarding the individual's automobile

insurance for any vehicle used while employed by Defendants (from July 5, 2014, to the present). Again, proof of insurance cards or policies is requested.

The fifth question seeks information regarding any service or repairs to the individual's vehicle/s during his or her tenure working for Defendants (and supporting documentation).

And finally, the sixth question asks whether the individual has filed for bankruptcy from July 5, 2014, to the present.

## C. Discussion

Defendants argue that under Rule 37's "broad and liberal treatment" standard, their questionnaire is appropriate, and the Court should compel Plaintiffs to respond. *See Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("[D]eposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case."). Defendants assert that the questionnaire seeks relevant information that they need in order to defend against Plaintiffs' underpayment and under-reimbursement claims.

 Defendants further argue that because each of the roughly 700 plaintiffs affirmatively opted in to this suit, they are not excluded from discovery. In contrast to a general class or a class wherein prospective members must opt-out, because Plaintiffs in this case were not automatically members until they chose to join the suit, Defendants have the right to pursue discovery and they must respond. This is mostly true.

As the District Court aptly noted in *Cranney v. Carriage Servs., Inc.*, "federal courts

have adopted various approaches to the scope of discovery permitted in FLSA actions." No. 2:07-CV-01587-RLHPAL, 2008 WL 2457912, at *2 (D. Nev. June 16, 2008). Some courts have treated opt-in plaintiffs in a collective action as ordinary party plaintiffs subject to the full range of discovery permitted by the Federal Rules of Civil Procedure. *See, e.g., Coldiron v. Pizza Hut, Inc.,* No. CV03-05865TJHMCX, 2004 WL 2601180, at *2 (C.D. Cal. Oct. 25, 2004) (permitting discovery of all 306 opt-in plaintiffs); *Krueger v. N.Y. Tele. Co.,* 163 F.R.D. 446, 449-52 (S.D.N.Y. 1995) (authorizing discovery addressed to all 152 opt-in plaintiffs); *Kass v. Pratt & Whitney,* No. 89-8343-CIV-PAINE, 1991 WL 158943, at *5 (S.D. Fla. Mar. 18, 1991) (authorizing individualized discovery from all 100 opt-in plaintiffs).

Other Courts, however, have limited individualized discovery, reasoning that extensive individualized discovery would undermine the purpose and usefulness of both class actions and collective actions, and instead have required only a representative sampling of the opt-in plaintiffs to respond to discovery. *See, e.g., Cranney,* 2008 WL 2457912, at *2 (limiting discovery from plaintiffs to 10% of approximately 300 opt-in plaintiffs); *Morales v. Farmland Foods, Inc.,* No. 08–CV–504, 2010 WL 4941708, at *4 (D. Nev. Nov. 30, 2010) (limiting written discovery to random 15% sample of 296 opt-ins); *Gentrup v. Renovo Servs., LLC,* No. 07–CV–430, 2010 WL 6766418, at *7 (S.D. Ohio Aug. 17, 2010) (rejecting defendant's request for full discovery from all 106 opt-ins, granting representative discovery consisting of written discovery from 31 plaintiffs and depositions from 16, and explaining that "[i]ndividualized discovery undermines the purpose and utility of collection actions and therefore limiting discovery to a statistically

significant representative sampling will both reduce the burden imposed on Plaintiffs and afford Defendants a reasonable opportunity to explore, discover, and establish an evidentiary basis for its defenses"); *Nelson v. Am. Standard, Inc.,* No. 08–CV–390–TJW–CE, 2009 WL 4730166, at *3 (E.D. Tex. Dec. 4, 2009) (rejecting defendant's request for written discovery from all 1,328 plaintiffs and ordering discovery from a "statistically acceptable representative sample" of only 91 plaintiffs).

The Ninth Circuit Court of Appeals has itself noted that the law in this area is unsettled. *See Hoffman v. Constr. Protective Servs., Inc.,* 541 F.3d 1175, 1179 (9th Cir. 2008). Today, the Court hopes to strike an appropriate balance between these two well-reasoned approaches.

The Court will discuss below the extent (i.e. the actual number of Plaintiffs) to which Defendants may serve its questionnaire, but first must address whether the subject matter at issue in the sought-after discovery is appropriate to begin with. It will then discuss a tailored approach to gain that information.

As noted, in this case the Plaintiffs have asserted claims for under-reimbursed automobile expenses, thus putting information about their automobiles at issue. As the Court has previously noted, "pre-trial discovery is ordinarily accorded a broad and liberal treatment because '*wide access to relevant facts serves the integrity and fairness of the judicial process* by promoting the search for the truth.'" *Thomas v. Cassia Cty.*, No. 4:17-CV-00256-DCN, 2018 WL 2224052, at *2 (D. Idaho May 15, 2018) (emphasis added) (quoting *Shoen*, 5 F.3d at 1292). Accordingly, because the questionnaire seeks information related to Defendants' "claim or defense,"—specifically its efforts to determine if it

underpaid its drivers, what those driver's reasonable expenses were, and/or what rate, if any, they should be reimbursed at—the Court finds it is appropriate. *See* Fed. R. Civ. P. 26(b)(1). Defendants have met their burden in showing the initial relevance of these questions.

The Court turns next to Plaintiffs efforts to shield themselves from Defendants' questionnaires. While Plaintiffs have specific objections to certain questions—some of which the Court shares—and hope to see the number of participants who must respond pared down—again, a proposition with which the Court agrees—their main argument against Defendants' Motion to Compel and in support of their own Motion for Protective Order is that the information is irrelevant because there is only one way for Defendants to reimburse Plaintiffs. Enter *Hatmaker*.

As previously noted, the *Hatmaker* court determined that there were only two ways to reimburse delivery drivers in situations such as those present in this case: 1) tracking and reimbursing drivers their actual vehicle costs, or 2) reimbursing drivers at the IRS standard business rate. In this case, Defendants have admitted that they did not track their driver's actual expenses. Dkt. 127-2, at 15. In accordance with this admission, Plaintiffs assert there is but one remaining methodology (the IRS rate) and, therefore, Defendant's questionnaire is wholly irrelevant. Again, while insightful, *Hatmaker* is not binding on this Court and is a far cry from being, as Plaintiffs put it, "the operative legal standard" applicable in this case. Dkt. 128, at 2. Indeed, the cases cited to the contrary belie Plaintiffs' point.

In essence, Plaintiffs are trying to direct discovery in this case using a framework

MEMORANDUM DECISION AND ORDER – 15

that the Court has yet to adopt. Will the Court adopt the same analysis as in *Hatmaker*? Maybe. Will the Court adopt an analysis similar to that of the District of Colorado? This too is possible. The fact that there are competing interpretations as to the operative legal standard in cases such as this highlights, however, the need to keep discovery broad in order to capture all relevant evidence that might be used at a later time. For example, were the Court to grant Plaintiffs motion at this time and *not* allow Defendants' discovery on this topic, but later determined that the appropriate standard is the "reasonable approximation" standard, the Court and counsel would not have anything to work with. It is better to undertake discovery on this topic now as opposed to reopening discovery later.

Plaintiffs also rely on the DOL Handbook and claim the Court should give it deference when determining this question. Notably, the DOL Handbook outlines that there are two methods (the same as above) for calculating vehicle costs and suggests in the absence of the first (i.e. in a situation where the company did not track expenses), the second is the correct choice. Plaintiffs correctly note, however, that the DOL Handbook is not binding on the Court.

While it might not be Plaintiffs' preferred methodology, caselaw supports Defendants' position that they have the right to argue they reasonably approximated Plaintiffs' expenses *without tracking their actual expenses.* Again, whether this is right or wrong remains to be seen, but at this point, discovery regarding this defense is fair and appropriate.

In sum, the Court finds the discovery Defendants' propound is, *in general*, relevant under Rule 26 and will compel Plaintiffs to respond under Rule 37. That said, the Court

next must talk about proportionality and analyze some of the thornier questions Defendants have proposed.

### 1. Proportionality

First, as the Court noted, its decision today strikes a fair balance between what it sees as the two competing schools of thought in the Ninth Circuit relative to discovery in FLSA (and/or class action) cases. The Court shares the opinion expressed by many of its fellow District Courts in this Circuit that in cases such as this, broad discovery directed at multiple (and sometimes all) class members is appropriate. The Court will allow Defendants to conduct discovery into these topics because the subject matter is relevant and the purpose for which they seek this discovery is a legally cognizable defense. That said, the Court also shares the opinion expressed by other Courts that, to a certain degree, extensive and individualized discovery of class members can undermine the process itself and has diminishing returns. To that end, the Court will allow Defendants to serve its questionnaire on a representative sampling.

Defendants object to such a process arguing that allowing them to only question a portion of the opt-in Plaintiffs will not give them the full and fair opportunity to "advance their particularized defenses against specific party plaintiffs' claims." Dkt. 126, at 13. This hesitation appears to be based on two concerns.

First, Defendants claim there are 150 individuals who have joined this action who they have no records of. They argue that without allowing them to question all 700 opt-in Plaintiffs, there will be no way to determine if those 150 individuals really worked for them or not. The Court understands the concern, but there is an easier way to remedy the

confusion. Defendants claim they have a list of these 150 individuals. For some odd reason, it appears Defendants are refusing to give this list to Plaintiffs to aid in trouble-shooting the discrepancy, stating instead that Plaintiffs can "cross-reference" Defendants' records with the opt-in forms. There is no reason to undertake this lengthy process. Defendants shall produce the list to Plaintiffs and then the parties shall meet and confer and work together to determine (to the best of their abilities) the accurate list of opt-in Plaintiffs.

Second, Defendants argue that without individualized questionnaires, they will not know who to depose and/or who to bring specific challenges against. The Court understands this concern as well, but again, the solution is not to send out more questionnaires, but to ensure that the questionnaires reach an appropriate subset of the larger group that fairly and accurately represents them. The Court's solution will allow for responses from each state and from each store. Accordingly, Defendants will have information regarding all federal claims and all state claims and can assess how to proceed from there. If there are specific indications that further discovery is needed in a particular state, Defendants can simply ask the Court to allow such an expansion of this order to allow for that. The Court will reassess the matter at that time.

Until the matter of the 150 plaintiffs is resolved, the Court will not know exactly how many Plaintiffs there are in this case. Nevertheless, a sampling of 200 plaintiffs will equate to roughly 29-33% of the total plaintiffs in this case (regardless of the final number). This is an appropriate representative group that can provide Defendants the information they need to "reasonably approximate" the expenses of its drivers. This number will be enough to accomplish Rule 26's interrelated goals of seeking out relevant information in

discovery and not unduly burdening the recipients. Defendants in this case own and operate approximately 63 stores in several states. Allowing Defendants to send out 200 questionnaires will allow for 2-4 responses from each store and cover multiple stores in each state.[5] Once the final number of Plaintiffs has been determined, Defendants and Plaintiffs shall meet and confer and randomly[6] select an appropriate number per store that the questionnaire can be sent to.[7]

### 2. Specific Questions

Second, some of Defendants' questions in its questionnaire appear to have only marginal relevance to the issues at hand and/or will be more difficult to understand and answer than any benefit they confer. The Court will quickly address each question.

#### a. Question #1 – Identifying Information

This is harmless, basic identifying information and can remain on the questionnaire.

#### b. Question #2 – Employment Information

This information is likewise not burdensome as it simply asks for employment information. As will be a repeated theme here however, Defendants should not be surprised

---

[5] It appears there is only one Defendant store in Minnesota, Mississippi, and North Dakota, while other states have multiple stores as Defendants in this case.

[6] For example, the parties could simply "shuffle" Plaintiffs in an excel list (or other application) which would yield a randomized ordering and then make their selections from there.

[7] The Court need not delve more into the logistics of this process and is purposefully leaving some "wiggle-room" in the execution of its order. For example, it is not difficult to imagine a situation where only 3-5 Plaintiffs may have joined this action from one store, but 10-20 Plaintiffs joined from another store. This might be a situation where only 1 or 2 questionnaires are sent to the smaller pool, while 6-8 are sent to the larger. In like manner, if 3-5 Plaintiffs from a particular store worked over 5 years ago, but 20 Plaintiffs are still currently employed for that same store, the sampling should reflect that reality. The Court's whole goal is to get a wide cross-sampling that fairly represents the various stores and states at issue so Defendants can mount an accurate defense.

if there is a lack of supporting documentation. The Court does not mean to disparage delivery drivers in any way; however, it is not difficult to imagine that many might not have kept records of the things they are now being asked to produce.

    c.  <u>Question #3 – General Automotive Information</u>

This information is, in general, basic and harmless. Some questions, however, are irrelevant and must be excised from the questionnaire before being sent out. Specifically, the name of the person who purchased the automobile is irrelevant. Regardless of who purchased the vehicle, a Plaintiff still used the vehicle for work, bestowed a benefit on the employer, and that work (and those expenses) are what is at issue in this case.

Again, asking for documentation (such as vehicle registration and/or fuel receipts) seems like an effort bound for failure. That said, the Court does not know what the respondents will produce and will not restrict Defendants ability to find out.

Next, the question regarding whether the individual sought an itemized tax deduction for unreimbursed expenses seems somewhat out of place. The Court understands the legal (and mathematical) concept Defendants are getting at, but the fact of the matter is this is largely irrelevant. What a Plaintiff put on his or her individual tax return is between the individual, their accountant, and the IRS. And regardless of what a Plaintiff may or may not have put down on their taxes does not absolve Defendants of their obligation to pay an employee appropriate wages under the FLSA.[8] This question (in the notes section) must be removed.

---

[8] Additionally, this question could have numerous unintended consequences. If, for example, a Plaintiff intentionally or accidentally misidentified certain expenses and/or was required (as a result of this litigation)

d.   Question #4 – Automobile Insurance

The general information in this section is appropriate and could be used to determine a driver's expenses; however, some questions are unnecessary. Who paid for the policy and the names of each person covered under the policy are irrelevant. Again, as with the question regarding who purchased a Plaintiff's vehicle, the question regarding who paid for the policy is not dispositive of anything in this case and would not change whether Defendants complied with the FLSA in their obligations to Plaintiffs. As with the tax question, the Court can see where Defendants are coming from with these questions (and disagrees with Plaintiffs that each is simply a guise to harass Plaintiffs), but again finds each is of no help to the issues in this case. Regardless of whether a person paid their own premium, paid only a portion of the premium, or were the recipient of someone's generosity, that is still an expense attributable to the Plaintiff that, depending on the outcome of this case, might need to be reimbursed. If the Plaintiff then reimburses his or her parent or grandparent who paid their premium five years ago, so be it; but Defendant does not need that knowledge to defend itself in this case. Additionally, whether there are other people on the policy is of little value. Those two questions shall be omitted.

e.   Question #5 – Service and Repair Information

This information is arguably some of the most relevant in determining a driver's general operating expenses; however, it will also likely be some of the most difficult to obtain. Again, some of the Plaintiffs are still employed by Defendants, may have had recent

---

to file an amended tax return (potentially up to six years after the fact), the purpose of the questionnaire has long since become lost in the disarray that followed.

repairs, and can readily produce the required documentation. However, the Court is concerned about Plaintiffs who worked for Defendants from 2014 to 2016 (for example), have a different vehicle now, or have moved (among other concerns). These situations could prove more problematic for an individual trying to find and produce the proper documentation. Nonetheless, the questions themselves are appropriate.

 f. <u>Question #6 – Bankruptcy</u>

 In the Court's opinion, this question is the most irrelevant of the six questions in the questionnaire. Defendants assert this information is necessary to ascertain Plaintiffs' assets (i.e. their automobiles), and could provide insight into a possible judicial estoppel defense (premised on the person's failure to disclose to the bankruptcy trustee a lawsuit or claim for damages). Both of these purported reasons do not justify the inclusion of this question.

 First, Defendants are already asking about the Plaintiffs' vehicles. There is no need to have this "back-up" question. Frankly, the question appears to be included in the off chance a Plaintiff lied on the prior question about vehicles, i.e. Defendants could then see on the bankruptcy asset list if the person owed any vehicles.[9] This question is a stretch, will not provide valuable information, and must be stricken.

 Second, asking this question in the hopes of catching a Plaintiff and their failure to list this lawsuit as a potential asset does not go to the heart of the claims at issue here. This is nothing more than a potentially ancillary attack on a Plaintiff that could have no bearing

---

[9] But even this premise is flawed because the person could have bought and/or sold any number of vehicles during their time of employment (or after) and/or could have declared bankruptcy before, during, or after their tenure working for defendants. Thus, an asset list in any bankruptcy proceeding may or may not be accurate and may or may not line up with their timeline of employment.

MEMORANDUM DECISION AND ORDER – 22

in reality (again, depending on when the bankruptcy was filed, what stage it is at and so on, the party could have been required to disclose this lawsuit or not). Asking questions about past or current bankruptcies does not add anything to this case. These questions shall not be included.

Separately, Plaintiffs take issue with Defense counsel putting their contact information on the questionnaire and opine that this could lead to *ex parte* communication with Defense counsel. This seems extremely unlikely. Furthermore, it is actually helpful for Plaintiffs to know where the questionnaire came from. The capitalized, bolded, underlined title makes it clear who this communication is from. This is appropriate.

That said, the Court does think it would be helpful (if Plaintiffs' counsel is willing) to include a contact phone number at the end of the second instruction found on page two. After noting that a person should not guess or estimate, a line such as the following could be included: "If you have further questions about this form, please contact Plaintiffs' counsel for this case at [phone number]." This would alleviate Plaintiffs' concern that a Plaintiff might mistakenly contact Defense counsel with questions. Furthermore, it goes without saying that the Court would expect Defense counsel, if contacted, to abide by the rules of professional conduct, tell the inquiring party they cannot speak to them, and direct them to call Plaintiffs' counsel. In addition, more information must be included regarding where the completed form should be returned to and shall be included with the fifth instruction on page two of the questionnaire.

Now, the Court has expressed concerns about certain questions and/or the overall effectiveness of the above questionnaire. This naturally begs the following question: why

undertake the exercise at all? Don't the Court's concerns signify that some questions are irrelevant or that the questionnaire is burdensome?

First, while the Court has expressed certain concerns, it obviously cannot know to what degree the questionnaire will be successful. It is not hard to imagine that people who worked for Defendants five or more years ago will have a difficult time providing worthwhile responses or producing the documentation Defendants desire. Conversely, there are numerous Plaintiffs who worked recently for Defendants and/or are still employed by Defendants and may be able to provide full and complete answers the Defendants' question with relative ease.[10] The Court will not know until the questionnaire is sent out and returned.

Second, this exercise—even if less than perfect—will prove helpful in this case (and others) regarding the underlying question of whether approximation is an appropriate theory and if so, how to calculate it.

In sum, while the Court has outlined a more tailored questionnaire that will go out to a more limited audience, it ultimately finds that the discovery sought is relevant and that Plaintiffs should be compelled to respond.

## V. CONCLUSION

The Court understands the underpinnings of Plaintiffs' argument. While *Hatmaker* (and other cases) and the DOL handbook support Plaintiffs' interpretation, *Blose*, *Kennedy*

---

[10] Frankly, this is (in part) why the Court is allowing a larger representative sampling in this case (as opposed to some of the 10-15% scenarios outlined in caselaw). While some questionnaires may come back near empty, the Court's hope is some will come back with information Defendants may be able to use to support their approximation argument.

(and other cases), as well as the DOL Letter support Defendants' position. This is clearly an open question, and different courts have come to differing conclusions regarding the appropriate standard for reimbursing delivery drivers. Accordingly, the Court cannot say that Defendants' position, and, in turn, their discovery in support of that argument, is irrelevant.

Defendants are entitled to engage in discovery in order to defend against Plaintiffs' claims and in support of their argument that they can approximate Plaintiffs' expenses. Defendants did not keep records, true. But that does not preclude them from asking Plaintiffs if they kept records. The Court does not know how helpful the questionnaire responses will be or what standard it will ultimately apply in this case, but this is a discovery question. Broad discovery parameters necessarily mean that some endeavors may yield better results than others, but that is part and parcel to litigation. Fairness dictates both sides have an opportunity to glean information regarding their claims and defenses. Fed. R. Civ. P. 26.

Defendants have persuaded the Court and their Motion to Compel will be granted to the extent the Court will allow such discovery. That said, the Motion will be denied to the extent that some of the questions in the questionnaire are unhelpful. Additionally, the Court is cognizant of the purpose of class action suits and finds a representative sampling is appropriate in this case. These considerations strike a fair balance between the parties' competing positions. Accordingly, as outlined above, certain questions shall be stricken prior to sending the questionnaire to 200 randomly selected Plaintiffs.

In turn, while the Court finds that Plaintiffs should be shielded from some of

Defendants' questions (and that a sampling is appropriate), Plaintiffs opted in to this suit and are subject to the same rules of discovery as plaintiffs in other cases. They cannot reasonably rely on *Hatmaker* as the "operative legal standard" and force Defendants to take a certain position when there is caselaw to the contrary. Defendants' discovery is broad, but not impermissibly so. Therefore, Plaintiffs' Motion for Protective Order is denied to the extent the Court will allow the questionnaire to be sent out, but granted in that the Court has stricken certain irrelevant questions and limited the overall number of questionnaires.

In sum, Defendants shall provide Plaintiffs with the list of the 150 disputed Plaintiffs. The parties shall meet and confer and resolve the discrepancies. Defendants shall remove the questions outlined above. The parties shall then meet and confer and randomly select 200 Plaintiffs and send them the questionnaire. These tasks should be completed by January 22, 2021. Plaintiffs who receive the questionnaire shall have 45 days from the date they receive the questionnaire to complete and return it to Defense counsel. Defense counsel shall provide Plaintiffs' counsel with copies of all the responses counsel receives.

## VI. ORDER

1. Defendants' Motion to Compel (Dkt. 126) is GRANTED in PART and DENIED in PART as outlined above.

2. Plaintiffs' Motion for Protective Order (Dkt. 127) is GRANTED in PART and DENIED in PART as outlined above.

3. The Parties' remaining Motions/Notices that have not already been addressed (Dkts. 141, 144) are GRANTED.

4.  The stay previously imposed in this case (*see* Dkt. 119) is LIFTED.

DATED: December 21, 2020

David C. Nye
Chief U.S. District Court Judge